No. 24-4333

# United States Court of Appeals for the Ninth Circuit

---

**SWINOMISH INDIAN TRIBAL COMMUNITY**,
A FEDERALLY RECOGNIZED INDIAN TRIBE,
*Plaintiff-Appellee,*

v.

**BNSF RAILWAY COMPANY**, A DELAWARE CORPORATION
*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Western District of Washington, Case No. 2:15-cv-543-RSL
Before The Honorable Robert S. Lasnik, United States District Judge

---

## ANSWERING BRIEF FOR PLAINTIFF-APPELLEE
## SWINOMISH INDIAN TRIBAL COMMUNITY

---

Christopher I. Brain
Rebecca L. Solomon
**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, WA 98101
(206) 682-5600
cbrain@tousley.com
rsolomon@tousley.com

Stephen T. LeCuyer
Weston R. LeMay
**OFFICE OF TRIBAL ATTORNEY**
11404 Moorage Way
La Conner, WA 98275
(360) 466-1058
slecuyer@swinomish.nsn.us
wlemay@swinomish.nsn.us

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

**INTRODUCTION** ......................................................................... 1

**JURISDICTIONAL STATEMENT** ................................................ 5

**STATEMENT OF ISSUES** .......................................................... 6

**STATEMENT OF THE CASE** ...................................................... 6

    A.     BNSF's predecessors construct a rail line across the Swinomish Reservation, set aside for the exclusive use of the Tribe. ...................................................................... 6

    B.     BNSF breached the Easement by running unit trains of Bakken Crude over the Reservation. ............................... 9

    C.     BNSF runs unit trains until this Court rules that its common carrier obligations do not abrogate Tribal rights. .................................................................................. 11

    D.     The district court finds that BNSF willfully, consciously, and knowingly trespassed over the Reservation. ......................................................................... 12

    E.     The Parties agree on the number of trespassing railcars, revenue, and variable costs. ................................. 12

    F.     BNSF cannot generate revenue from direct rail service to the Fidalgo Refineries unless it crosses the Reservation. ......................................................................... 14

    G.     The district court enters $394,517,169 disgorgement award after apportioning BNSF's profits based on the Portland Alternative. ..................................................... 18

**SUMMARY OF ARGUMENT** ...................................................... 24

**STANDARD OF REVIEW** ........................................................... 27

**ARGUMENT** .............................................................................. 29

I. Profit generated from railcar movements over the Reservation to the nearby refineries are not "remote" from BNSF's trespasses. ...................................................... 31

    A. The District Court did not abuse its discretion in finding that BNSF's profits from transporting railcars were directly attributable to the trespasses over the Reservation. ....................................................... 32

    B. BNSF presented no evidence to support its "unduly remote" arguments. ............................................. 33

II. This Court should not second-guess the district court's apportionment analysis. ............................................... 39

    A. The district court's apportionment was not an abuse of discretion. ........................................................... 41

    B. The district court properly excluded evidence related to BNSF's ability to serve other customers. ......................... 45

    C. The district court was not required to consider BNSF's ability to average local train traffic. .................................. 47

    D. BNSF's reliance on factually distinct cases hardly renders the district court's apportionment here an abuse of discretion. ............................................. 49

        1. *The remoteness analysis applied to consequential gains is inapplicable.* ......................... 50

        2. *BNSF relies on materially distinct trespass cases.* ...................................................... 53

        3. *Intellectual property cases are poor comparisons because the resulting products have multiple, independent profit drivers.* ...................... 56

III. BNSF did not present trial evidence to support
     tethering the disgorgement remedy to a hypothetical rent. ....... 59

    A.    BNSF's unjust enrichment is measured by its wrongful
     gain. .................................................................................. 59

    B.    An award tied to hypothetical rent would disregard the
     Tribe's sovereignty. ........................................................... 62

    C.    Limitations on punitive awards do not apply to
     disgorgement awards because disgorgement awards
     are not punitive. ................................................................. 67

IV.  The district court correctly declined to deduct all of BNSF's
     fixed costs. ............................................................................... 68

V.   BNSF did not raise the district court's purported math
     errors below. ........................................................................... 72

**CONCLUSION** ................................................................................. 73

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. City of Bessemer City, N.C.*,
470 U.S. 564 (1985) ............................................................... 37

*Bad River Band of the Lake Superior Tribe of Chippewa
Indians of the Bad River Reservation v. Enbridge Energy
Company*,
1 No. 19-cv-602-wmc, 2023 WL 4043961 (W.D. Wis. June
16, 2023) .................................................................................... 55

*Beck v. Northern National Gas Company*,
170 F.3d 1018 (10th Cir. 1999) ........................................... 54

*Cream Records, Inc. v. Jos. Schlitz Brewing Company*,
754 F.2d 826 (9th Cir. 1985) ........................... 28, 38, 39, 45

*In re de Jong*,
588 B.R. 879 (B.A.P. 9th Cir. 2018), *aff'd* 793 F. App'x 659
(9th Cir. 2020) ....................................................................... 41

*Edwards v. Lee*,
96 S.W.2d 1028 (Ky. 1936) ............................................. 53, 54

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
778 F.3d 1059 (9th Cir. 2015) ..................................... 27, 29

*Garretson v. Clark*,
111 U.S. 120 (1884) ............................................................... 58

*Holland v. Fla.*,
560 U.S. 631 (2010) ............................................................... 49

*Janigan v. Taylor*,
344 F.2d 781 (1st Cir. 1965) ........................................... 5, 51

*Kamar Int'l, Inc. v. Russ Berrie & Co.,*
752 F.2d 1326 (9th Cir. 1984) ............................................................. 70

*Klein-Becker USA, LLC v. Englert,*
711 F.3d 1153 (10th Cir. 2013) ............................................................ 28

*LaserDynamics, Inc. v. Quanta Comput., Inc.,*
694 F.3d 51 (Fed. Cir. 2012) ................................................................ 57

*Liu v. SEC,*
591 U.S. 71 (2020) ............................................................................ 4, 67

*Metal Jeans, Inc. v. Metal Sport, Inc.,*
987 F.3d 1242 (9th Cir. 2021) ............................................................. 27

*Olwell v. Nye & Nissen Company,*
26 Wash.2d 282 (1946) ....................................................................... 38

*Pauma Band of Luiseno Mission Indians of Pauma & Yuima
Rsrv. v. California,*
813 F.3d 1155 (9th Cir. 2015) ............................................................. 30

*Randall v. Loftsgaarden,*
478 U.S. 647 (1986) .......................................................................... 5, 56

*Raven Red Ash Coal Co. v. Ball,*
29 S.E.2d 231 (Va. 1946) .................................................................... 62

*S.E.C. v. Ahmed,*
72 F.4th 379 (2d Cir. 2023) ........................................................... 50, 51

*S.E.C. v. Hui Feng,*
935 F.3d 721 (9th Cir. 2019) ............................................................... 27

*Sheldon v. Metro-Goldwyn Pictures Corporation,*
309 U.S. 390 (1940) ...................................................................... 56, 57

*Sheldon v. Metro-Goldwyn Pictures Corporation,*
106 F.2d 45 (2d Cir. 1939) .................................................................. 40

*Siebel v. Scott,*
725 F.3d 995 (5th Cir. 1984) ............................................................... 51

vi

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ................................................................. 62

*Swinomish Indian Tribal Community v. BNSF Railway*
    *Company,*
    951 F.3d 1142 (9th Cir. 2020) ........................................ 8, 65

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.,*
    52 F.4th 1054 (9th Cir. 2022) ............................................. 46

*United States v. Adams,*
    271 F.3d 1236 (10th Cir. 2001) .......................................... 46

*United States v. Hinkson,*
    585 F.3d 1247 (9th Cir. 2009) ............................................ 27

*United States v. Osage Wind, LLC,*
    710 F. Supp. 3d 1018 (N.D. Okla. 2023) ............................ 64

*United States v. Pend Oreille Cnty. Pub. Util. Dist. No. 1,*
    135 F.3d 602 (9th Cir. 1998) .............................................. 64

*United States v. Washington,*
    459 F. Supp. 1020 (W.D. Wash. 1978) ................................. 7

*Washington v. Washington State Commercial Passenger*
    *Fishing Vessel Ass'n,*
    443 U.S. 658 (1979) ........................................................... 6, 7

## Statutes

25 U.S.C. § 357 ........................................................................ 64

25 U.S.C. § 476 .......................................................................... 6

12 Stat. 927 (1855) ..................................................................... 6

## Other Authorities

Mark P. Gergen, Causation in Disgorgement,
    92 Boston University Law Review 827, 829 (2012) ............ 62

Restatement (Third) of Restitution § 1 cmt. a .................................. 28, 60

Restatement (Third) of Restitution § 3 .................................................. 29

Restatement (Third) of Restitution § 3, cmt. c ................................. 60, 61

Restatement (Third) of Restitution § 40, ill. 5 ........................................ 54

Restatement (Third) of Restitution § 40 cmt. b ............................... 61, 66

Restatement (Third) of Restitution § 51(2) ............................................. 65

Restatement (Third) of Restitution § 51(4) ................................ 30, 56, 67

Restatement (Third) of Restitution § 51(5) ................................ 30, 68, 69

Restatement (Third) of Restitution § 51 cmt e. ...................................... 34

Restatement (Third) of Restitution § 51 cmt. f. ............................. *passim*

Restatement (Third) of Restitution § 51 cmt. g. ............................... 17, 40

Restatement (Third) of Restitution § 51 cmt. h ............................... 58, 69

Restatement (Third) of Restitution § 53 cmt. d, ill. 11 .......................... 52

Restatement (Third) of Restitution § 58 cmt. i, ill. 26 ..................... 51, 52

## INTRODUCTION

This case is about providing a meaningful remedy for blatant and willful trespasses over sovereign tribal land that occurred for nearly a decade. BNSF operates a rail line that crosses the Swinomish Indian Reservation pursuant to a negotiated easement that limits BNSF to one train of 25 cars in each direction per day. BNSF did not come close to honoring that agreement. Instead, BNSF knowingly ran thousands of 100-car single-purpose, single-destination trains carrying Bakken crude oil across the Reservation over the Tribe's objections.

The Swinomish Indian Tribal Community ("Tribe") informed BNSF that it was trespassing over the Reservation in 2012. BNSF acknowledged that the Tribe had not consented to the increased rail traffic, but refused to stop. Even after the Tribe sued BNSF in 2015, BNSF continued its trespasses until 2021. BNSF's reason was simple: trespassing was immensely profitable, and BNSF had no viable alternative to getting the Bakken crude directly to its refinery customers on the far side of the Reservation. As the district court found, BNSF made nearly $400 million in profits as a direct result of its trespasses.

1

The proper remedy for BNSF's trespass is straightforward: disgorgement of BNSF's profits. Requiring BNSF to turn over the wrongfully gained trespass profits is the only way to affirm the Tribe's sovereignty and to prevent BNSF from profiting from its willful misconduct. Anything less would do little to deter future wrongdoing and would unlawfully authorize de facto condemnation of sovereign land. After all, if BNSF knows it can make hundreds of millions in profits by trespassing on tribal land while paying only what amounts to modest post hoc rent, BNSF and others will have every incentive to trespass again in the future. The district court recognized those principles. After holding a four-day bench trial, it ordered BNSF to disgorge $394,517,169.

BNSF's efforts to avoid the consequences of its trespass lack merit. BNSF no longer challenges the conclusion that it willfully and knowingly trespassed over Reservation land. Nor does it challenge the district court's conclusion that disgorgement is the appropriate remedy. Its principal argument is that the district court miscalculated the disgorgement award because it purportedly failed to consider whether the profits it disgorged were "unduly remote" from the trespass. That

argument is borderline frivolous. Whether profits are "unduly remote" is a question of causation, *see* Restatement (Third) of Restitution § 51 cmt. f (2011), and here, there is no serious argument that the trespass was both the but-for and proximate cause of BNSF's gains. There is nothing remote—physically or legally—about the trespass and BNSF's profits obtained delivering Bakken crude to a refinery on the far side of the Reservation. Every rail car BNSF delivered had to and did cross the Reservation. Thus, all the profits that BNSF earned from those shipments are the direct result of the trespass. The causal link is as direct (and foreseeable) as it gets.

BNSF is really complaining about *apportionment*—i.e., how the district court allocated BNSF's profits attributable to the unlawful trespass and other contributing causes—not remoteness as it claims. *See* Restatement (Third) of Restitution § 51 cmt. f. But there is a reason BNSF tries to disguise its apportionment arguments as something else. BNSF bore the burden to show what, if any, of its profits were sufficiently attributable to its lawful conduct to justify their exclusion from the disgorgement order. By framing the issue as a challenge to whether the district court conducted the causation analysis (which it

did) as a legal question subject to *de novo* review and impermissibly conflating it with the district court's apportionment analysis (a factual determination subject to significant deference), BNSF attempts to avoid the consequences of its failure to meet this evidentiary burden. While BNSF presented several theories of apportionment, the district court carefully considered and rejected all of them as unreflective of reality. BNSF briefly mentions those theories in its opening brief, but it does not attempt to explain why the district court's rejection of its methodologies was wrong, let alone clear error.

BNSF's remaining arguments are equally unavailing. BNSF argues that the disgorgement award is "vastly disproportionate to the loss imposed by BNSF's wrongdoing." Br. at 43. But that argument misunderstands the purpose of disgorgement. Disgorgement does not intend to compensate the plaintiff for its losses, but to vindicate the core principle that no person shall "profit by his own wrong." *Liu v. SEC*, 591 U.S. 71, 80 (2020). And while restitution may therefore result in a "windfall" for the plaintiff, the alternative is to give a windfall to the wrongdoer by allowing it to profit from its wrongdoing. Between those alternatives, the choice is not difficult. Courts of equity have long

recognized that "[i]t is more appropriate to give the [plaintiff] the benefit even of windfalls than to let the [wrongdoer] keep them." *Randall v. Loftsgaarden*, 478 U.S. 647, 663 (1986) (quoting *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir. 1965)).

BNSF insists that the district court erred by failing to consider whether it would have nevertheless made the same profits via alternative means—such as by shipping crude to other customers or rescheduling local trains. But "a finding that the defendant would have realized the profit in any event does not compel the conclusion that the defendant, under the circumstances, has not been unjustly enriched." Restatement (Third) of Restitution § 51 cmt. f. And in all events, the district court's decision to reject BNSF's speculation that it could have made the same profits through lawful means does not constitute error. BNSF knew it was trespassing since 2012. If BNSF really could have earned the same profits through lawful means, surely it would have done so. That BNSF continued its intentional trespass is indisputable. This Court should affirm.

## JURISDICTIONAL STATEMENT

The Tribe agrees with BNSF's jurisdictional statement.

5

## STATEMENT OF ISSUES

Whether the district court properly exercised its broad discretion in applying equitable disgorgement principles when it ordered BNSF to disgorge its substantial profits generated by its repeated and concededly willful trespasses over the Swinomish Reservation from 2012 to 2021.

## STATEMENT OF THE CASE

**A.     BNSF's predecessors construct a rail line across the Swinomish Reservation, set aside for the exclusive use of the Tribe.**

The Tribe is federally-recognized, organized under the Indian Reorganization Act of 1934, 25 U.S.C. § 476, and a successor to signatories of the 1855 Treaty of Point Elliott, 12 Stat. 927 (1855), which established the Swinomish Reservation on Fidalgo Island in Washington state. SER-16–17. The Treaty was one of several executed with the United States by which Indian tribes relinquished Western Washington for monetary payments and parcels of land "reserved for their exclusive use." *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 662 n.2 (1979).

6

BNSF operates a rail line across the northernmost edge of the Reservation, cutting through the Tribe's economic infrastructure that is a primary source of funding for the Tribe's governmental functions and programs. SER-18. The railway traverses two Reservation water bodies in which the Tribe has Treaty-reserved fishing rights: Swinomish Channel via swing bridge and Padilla Bay by trestle. *Id.*; *United States v. Washington*, 459 F. Supp. 1020, 1049 (W.D. Wash. 1978).



SER-73.

Inexplicably, BNSF mischaracterizes its predecessor's century of trespass as far briefer and more benign than is reflected by the undisputed facts. The history of the rail line and the prior litigation is

fully set out in this Court's opinion, *Swinomish Indian Tribal Community v. BNSF Railway Company*, 951 F.3d 1142, 1146–48 (9th Cir. 2020); *see also* 3-ER-368–380.

Briefly, the railway was initially constructed around 1889 over the Tribe's objection. SER-17. BNSF's predecessors used the line without the Tribe's consent for decades, leading the Tribe to commence eviction litigation in the 1970s. SER-17–18. The litigation continued for over a decade before the parties reached a settlement that, *inter alia*, authorized limited future rail traffic over the Reservation, pursuant to an Easement Agreement. SER-18–19. Specifically, that Easement limits the number of trains and railcars that are permitted to cross the Reservation each day:

> Burlington Northern agrees that, unless otherwise agreed in writing, only one eastern bound train, and one western bound train, (of twenty-five (25) cars or less) shall cross the Reservation each day. The number of trains and cars shall not be increased unless required by shipper needs. The Tribe agrees not to arbitrarily withhold permission to increase the number of trains or cars when necessary to meet shipper needs. . . .

3-ER-436. Burlington Northern agreed to pay $125,000 for "all rent, damages and compensation of any sort, due for past occupancy of the

right-of-way from date of construction in 1889 until January 1, 1989." 3-ER-429.

## B. BNSF breached the Easement by running unit trains of Bakken Crude over the Reservation.

The rail line serves two refineries just west of the Easement (the "Fidalgo Refineries"). SER-20. Between 2011 and the present, one of the refineries was owned and operated by Tesoro Refining & Marketing Company ("Tesoro"), which Marathon Petroleum Company ("Marathon") acquired in 2018. *Id*.

In October 2011, the Tribe learned that Tesoro sought a permit for a new facility to off-load "unit trains" of crude oil that would necessarily be transported over the Reservation. SER-52. Unit trains consist of approximately 100 railcars carrying a single commodity between a single origin and destination without any intermediate stops. 5-ER-741–42; 3-ER-294. The Tribe sent a letter reminding BNSF of the volume restrictions and that the Tribe had not consented to any increases in rail traffic. SER-52. BNSF employees and attorneys received this letter yet never responded. SER-21.

Nearly a year later, on September 4, 2012, BNSF ran the first unit train carrying Bakken crude oil from North Dakota over the

Reservation. SER-21, SER-25. BNSF did not provide notice or obtain the Tribe's prior consent. SER-21. Once the Tribe learned that BNSF had breached the Easement's limitations, its Chairman sent a letter demanding that BNSF immediately comply with the Easement. SER-54–55.

BNSF finally responded to the Tribe's correspondence in November 2012. SER-22. Over the next two years, the Tribe and BNSF discussed the ongoing unauthorized traffic over the Reservation. SER-22–24. At no point during these discussions did BNSF request the Tribe's consent for additional rail traffic. At no point did the Tribe consent to additional traffic. And at no point did BNSF cease unit train operations over the Reservation. In December 2014, BNSF confirmed that it had no intention of complying with the Easement's limitations. SER-71.

Even after the Tribe filed suit in April 2015, BNSF continued to run—and increase the number of—unit trains. Indeed, between September 2012 and May 2021 (the "Trespass Period"), BNSF transported 2,290 unit trains (~229,000 railcars) over the Reservation. 1-ER-8. BNSF also failed to adhere to the 25-car daily limit with respect

to the "local"[1] trains authorized by the Easement, ultimately transporting 37,655 excess local railcars over the Reservation. 1-ER-8.

## C. BNSF runs unit trains until this Court rules that its common carrier obligations do not abrogate Tribal rights.

In response to the Tribe's suit, BNSF claimed that it could not—and therefore was not obligated to—comply with the Easement due to its common-carrier obligations under the Interstate Commerce Commission Termination Act ("ICCTA"), which it argued preempted the Easement, the Indian Right of Way Act, and federal Tribal rights. 3-ER-380. The district court ruled that ICCTA did not bar the Tribe's federal common law trespass claim, but authorized an interlocutory appeal to this Court. 3-ER-402–408. This Court affirmed and held that ICCTA did not abrogate the Tribe's treaty rights or the IRWA, or otherwise excuse BNSF's ongoing trespass. 3-ER-368–401. More than a year after this Court's decision was issued, BNSF finally began to comply with the Easement. SER-27.

---

[1] In contrast with "unit trains," "local" trains are comprised of cars from numerous origins that are organized by BNSF. 5-ER-695–96; SER-25.

**D.  The district court finds that BNSF willfully, consciously, and knowingly trespassed over the Reservation.**

On March 20, 2023, the district court held a bench trial to resolve one issue: whether BNSF willfully, consciously, and knowingly trespassed over the Reservation. 3-ER-292. The parties and the district court agreed that BNSF bore the burden to establish that it acted in good faith when it violated the Easement. 3-ER-303. Upon finding that BNSF's trespasses were willful, conscious, and knowing, the district court held that "the Tribe is entitled to equitable remedies, including the recovery from BNSF of profits made by the unlawful entry." 3-ER-305–306. BNSF does not challenge the willful, conscious, and knowing trespass findings.

**E.  The Parties agree on the number of trespassing railcars, revenue, and variable costs.**

To determine its profits, BNSF produced internal accounting records from its Activity Based Costing Systems ("ABS"), which consolidates daily all revenues received and costs incurred for completed moves. SER-26. Where possible, ABS assigns variable costs (e.g., costs that vary with incremental changes in volume) to individual railcar and locomotive movements using factors BNSF has developed to

12

identify and assign the variable component of *every* cost in its operations, including overhead costs. SER-26. Any costs that are not associated with individual movements are fixed costs. 4-ER-534–35; *Cf.* 5-ER-523 (defining variable costs).

In the railroad industry, "contribution" means revenue obtained from particular rail movements less variable costs associated with those movements. SER-27. Contribution reflects what an individual movement can "contribute" to defray company-wide fixed costs, interest expenses, and taxes, with the remainder comprising net company profit. 4-ER-523–24; 4-ER-580. Based on BNSF's ABS data, the parties agreed on BNSF's total revenues and variable costs, and contribution from the trespassing unit and local train traffic during the Trespass Period. SER-27. The agreed total trespass contribution was $444,956,537 (local train contribution of $42,697,024 plus unit train contribution of $402,259,513). 1-ER-6.

The parties disagreed, however, as to whether BNSF could deduct fixed costs, interest expense, and income taxes in calculating disgorgeable profit. BNSF does not assign or attribute any portion of its fixed costs, interest expense, or income taxes to individual movements

13

in its normal course of business. SER-26. For strategic purposes, BNSF internally allocates portions of its fixed costs to different business segments. 4-ER-625–628. These allocations, however, do not reflect actual "fixed cost" expenditures associated with any given route or movement. 4-ER-635. Although it would have been possible to identify the specific fixed costs that directly contributed to rail traffic over the Reservation and the profitability of individual routes, BNSF did not undertake these analyses. 4-ER-625, 4-ER-635–36.

## F. BNSF cannot generate revenue from direct rail service to the Fidalgo Refineries unless it crosses the Reservation.

The parties also disputed whether BNSF's non-trespassing use of its network entitled it to retain any portion of its profits. Rail transportation is a unitary service from origin to destination—shippers pay BNSF for completed deliveries, not on a per-mile basis. BNSF's entire rail network is useless to its shippers unless BNSF can reach the destination; if it cannot cross a particular segment, all the preceding miles are irrelevant. Indeed, BNSF realized the revenues from rail service to the Fidalgo Refineries only after it completed delivery. SER-25. It is undisputed that BNSF cannot complete delivery by rail to the refineries without crossing the Reservation. SER-28. And BNSF would

never have run trains from North Dakota to Fidalgo in the first place if it could not get paid. 5-ER-743–44.

Because the Refineries would not pay BNSF to transport railcars up to the swing bridge and stop, the Tribe's expert opined that BNSF's profits could not be apportioned across different segments of a route. 4-ER-560–61; 4-ER-569–70; 4-ER-595. BNSF's expert, in contrast, contended that because the Easement is less than 1 mile, BNSF should retain a substantial pro-rata portion of BNSF's internally calculated profits (which included deductions for fixed costs, interest, and taxes), suggesting that each mile in the route contributed equally to BNSF's ability to generate the profits. 4-ER-649, 4-ER-651–52. Alternatively, he proposed utilizing Surface Transportation Board formulas for allocating revenues between multiple rail carriers. 4-ER-652–56.

BNSF's expert's rebuttal report raised two new issues to support his pro-rata apportionment methodologies: (1) passing references to BNSF's practice of transporting Bakken crude between 2019 and 2021 to a facility in Portland to be transloaded[2] for barging to Marathon (the

---

[2] Transloading is the process of moving a product from one method of transportation to another. 4-ER-540.

"Portland Alternative"), which BNSF claimed resulted in 20% less profit than direct rail shipment over the Reservation; and (2) BNSF's ability to transport Bakken crude to other, unidentified customers. 6-ER-1039–41. BNSF's expert similarly testified about the Portland Alternative at trial. 4-ER-664, 668–69.

In ruling on cross-motions for summary judgment, Judge Lasnik found that "BNSF was paid for completed movements to the refineries, not for completed miles or segments of the route. Bringing unit trains 1490 miles from the Bakken formation to the Swinomish Reservation would have generated no income, much less profit." 1-ER-28. With respect to the calculation of profits, the district court held that BNSF was entitled to deduct only *marginal* costs and BNSF failed to quantify what fixed costs were "incurred in generating the revenues at issue." 1-ER-33; *see also* 1-ER-34 (rejecting income tax deduction). It held that by identifying the total contribution, the Tribe met its initial burden to approximate BNSF's profits, and that the burden therefore shifted to BNSF "to show that some portion of the profit 'would have been realized in the absence of the wrong' and that apportionment of the net profits on a per mile or per segment basis is warranted." 1-ER-29 (quoting

Restatement (Third) of Restitution § 51 cmt. g). The district court found that the Portland Alternative established a triable issue of fact with respect to apportionment. 1-ER-30.

Although BNSF disclaimed seeking "credit" for its Portland shipments and asserted that it relied on the Portland Alternative only to establish that its entire network enabled its ability to provide service, 4-ER-668–69, Judge Lasnik understood the Portland Alternative as a way to divide the route to Fidalgo into two distinct segments, either of which would allow BNSF to realize some profit delivering Bakken crude to Tesoro/Marathon. 1-ER-37 (stating "some distance-based apportionment" could be found). Specifically, based on the court's comment at the summary judgment hearing that "it's more likely that it will be somewhere in the double-digit millions," 4-ER-503, the Tribe anticipated that the court contemplated an award of 20% of BNSF's contribution (approximately $89 million)—which reflected either the relative distance or relative profits from transporting railcars beyond Portland to Fidalgo. *See* 5-ER-826–831.

In the two weeks between the summary judgment ruling and the remedy trial, the Tribe searched the public record for the actual

volumes of Bakken crude transported by rail to Portland to understand whether Portland was a viable alternative for the entire Trespass Period. The Tribe located information submitted by Zenith—the transloading facility used by BNSF and Marathon—to the Oregon Department of Environmental Quality ("DEQ") showing exactly how many barrels of Bakken crude and other commodities were transloaded between November 2018 (when Zenith received its transloading permit) and 2023. SER-77–121; 1-ER-22–23 (describing the Tribe's efforts to obtain DEQ documents and denying motion to exclude); *see also* 5-ER-779, 784.

## G. The district court enters $394,517,169 disgorgement award after apportioning BNSF's profits based on the Portland Alternative.

On June 4, 2024, the district court commenced a bench trial to determine the appropriate disgorgement for BNSF's willful, conscious, and knowing trespasses over the Reservation. 1-ER-3. In addition to expert testimony about proposed apportionment methodologies and BNSF's internal revenue and cost recording practices, much of the testimony focused on alternative methods for transporting Bakken crude to Fidalgo.

The evidence showed that during the Trespass Period, Marathon and BNSF investigated other methods for transporting Bakken crude along the west coast. 5-ER-780–81. These efforts primarily focused on a proposed unit train offloading facility near Vancouver, Washington called Vancouver Energy. 5-ER-687–689, 5-ER-715–716; 5-ER-782. Marathon invested tens of millions of dollars between 2013 and late 2017 into Vancouver Energy but could not get the required permits, ultimately abandoning the project in 2018. 5-ER-688–89; 5-ER-715–716, 5-ER-725; 5-ER-782-83, 5-ER-804. As one Marathon witness testified, permitting a fossil fuel facility was "very difficult in Portland." 5-ER-690. Although a BNSF witness denied the obvious reality that new fossil fuel facilities in the Pacific Northwest typically face public opposition, he admitted that both Vancouver Energy and a Zenith expansion faced opposition, 5-ER-805, and that Portland has banned new unloading facilities. 5-ER-813.

Marathon witnesses testified that Marathon investigated two other options for transloading Bakken in the Pacific Northwest only after it became clear that Vancouver Energy would not be permitted: Port Westward in Clatskanie, Oregon and Zenith. 5-ER-688–689; 5-ER-

716–17; *see also* 5-ER-782 (describing Zenith and Port Westward as primary focus for BNSF). Marathon did not utilize Port Westward because it had limited capabilities and exclusively processed ethanol for the majority of the Trespass Period. 5-ER-723–24; 5-ER-787–92, 5-ER-809.

Instead, Marathon began limited Bakken transloading at Zenith in 2019. 5-ER-725. At trial, Marathon's rail operations director confirmed that all Bakken crude oil transloaded at Zenith between 2019 and 2023 was Marathon's. 5-ER-708, 5-ER-726–34. Since 2019, Zenith has expanded its offloading capacity; at its current maximum capacity, Zenith can accommodate roughly one unit train every other day, compared to the Fidalgo receiving facility which can discharge an entire train at a time. 5-ER-734-736; 5-ER-784-85, 5-ER-812-13.[3]

To facilitate the district court's review of the Zenith records, the Tribe's expert prepared spreadsheets summarizing the gallons delivered by crude type for each year, converting those figures into the number of

---

[3] While a BNSF witness testified that the Portland area facilities eventually had equal capacity to Fidalgo, he could not identify the specific volume capacities of the facilities at any point during the Trespass Period. 5-ER-783-84; *see* 1-ER-13 (finding this testimony not credible).

corresponding railcars, comparing those volumes to the number of trespassing railcars between 2018 and 2021, and showing how many additional Bakken railcars Zenith might have accommodated during the Trespass Period. SER-122–125. As the Tribe's expert testified, these spreadsheets merely reflected the application of basic math to uncontroverted numbers. 5-ER-818–826.

On June 17, 2024, the district court held that BNSF was unjustly enriched in the amount of $394,517,169. 1-ER-20. The district court allowed BNSF credit for one-third of its long-term fixed costs based on the testimony of BNSF's controller generally identifying some categories of fixed costs that could vary over the lengthy Trespass Period. 1-ER-5–8.

Turning to apportionment, the court expressly found "BNSF's efforts to show that it could have used . . . its network to make profit by servicing other customers and refineries [] unavailing," recognizing that if this were the rule, then wrongdoers with more than one customer could always evade liability. 1-ER-9. The court further rejected all of BNSF's apportionment methodologies which sought to "break the route into unworkable segments that do not align with any rail facilities and

would not result in the delivery of materials to the March Point refineries." 1-ER-10. Even if such methodologies could be appropriate where BNSF was only paid for completed movements, the court found that "allocation schemes that would allow BNSF to retain between 94.1% and 99.9% of the profits earned from a line of business that was negotiated and provided only because BNSF was willing to intentionally, consciously, and knowingly interfere with the Tribe's property rights would not deprive BNSF of its unjustly earned gains or deter future wrongful conduct." *Id.*

Instead, the court calculated the portion of BNSF's profits generated from the lawful use of its rail network by determining "what it was paid over and above the non-trespassing [Portland] alternative while retaining net profits arising from the legitimate use of its rail network to get Bakken crude to Portland." 1-ER-11. In other words, the district court found that the rail network provided value only to the extent it could be used to actually make a delivery to the customer and BNSF bore the burden to show that such deliveries were possible. 1-ER-9–10.

Based on all the evidence presented about alternative methods to transport Bakken crude to the Fidalgo Refineries during the Trespass Period, the district court found that Zenith was the only viable alternative, and only between November 2018 and May 2021. 1-ER-11–18. Using the DEQ data, the court calculated the total number of railcars that might have been transloaded at Zenith during the Trespass Period (33,094)—assuming a maximum capacity equal to the reported volume in the highest three consecutive months in 2023—and allowed BNSF to retain 72.52% of the average profit per car as legitimately earned.[4] 1-ER-13–16.

After deducting one-third of BNSF's fixed costs, apportioning profits, and applying BNSF's money market rate to calculate prejudgment interest or "supplemental enhancement," the district court calculated a final disgorgement amount of $394,517,169. 1-ER-18–20.

---

[4] BNSF complains that the district court allowed the Tribe's expert to provide new calculations during trial but ignores that the district court did not rely on any of those calculations. 1-ER-13–16.

## SUMMARY OF ARGUMENT

1. The district court correctly ordered BNSF to disgorge the profits it earned trespassing on the Reservation. BNSF's principal argument on appeal is that the district court miscalculated the disgorgement award because it purportedly failed to consider whether the profits it disgorged were "unduly remote" from BNSF's trespass. This makes little sense. BNSF could not reach the refineries without crossing the Reservation and it would not get paid if it did not deliver to the refineries—all of its profits were directly attributable to its wrongdoing. BNSF conflates causation with apportionment and incorrectly argues that they are the same. They are not. At most, a finding that lawful activity contributed to the profits might require the trial court to engage in an apportionment analysis. But this is exactly what the district court did. And any requirement to consider apportionment after determining causation does not, as BNSF argues, require any particular apportionment methodology as a matter of law.

2. BNSF's arguments challenging the district court's adoption of the Portland Alternative for apportionment are obvious factual disagreements, not legal challenges. Courts have broad discretion to

24

apportion based on the facts and circumstances in the particular case as well as the interests of justice. BNSF bore the burden to establish that it would have generated some of the profit through its legitimate activities in the absence of wrongdoing. It failed to do so and the district court consequently rejected BNSF's methodology. The apportionment applied by the district court is well supported by the evidentiary record and is entitled to deference by this Court. The district court expressly rejected BNSF's apportionment. This Court should not reweigh the evidence on appeal.

3.     The district court did not abuse its discretion in declining to tether the disgorgement remedy to a hypothetical rental rate for BNSF's use of Tribal land over the Tribe's repeated objections. The district court could not have fashioned such a remedy because BNSF did not present any evidence at trial related to this theory. But even if BNSF had not abandoned it, reasonable rental rates are *not* the appropriate remedy for conscious trespassers because allowing a knowing trespasser to limit liability to rent it never negotiated would effectively legitimize private eminent domain. Such a remedy— particularly where the trespass continued for many years—would allow

BNSF to profit substantially from its conscious wrongdoing and ignores tribal sovereignty. Indeed, the *de facto* condemnation of tribal trust land that BNSF's asks this court to sanction would violate federal law.

BNSF falsely claims that the Tribe was not injured by its trespasses, ignoring that BNSF invaded a sovereign's land and deprived the Tribe of its Treaty and statutory rights to consent to entry into and use of its Reservation. BNSF's disregard of the Tribe's sovereign authority not only inflicted irreparable harm, but amply supports a rent-based damages-type remedy is inappropriate and shows that equitable disgorgement is essential.

4.     The district court did not abuse its discretion by refusing to deduct all of BNSF's claimed overhead expenses in calculating disgorgement. A defendant may only receive a deduction for *marginal* costs and not for overhead expenses it would have incurred anyway. BNSF failed to present any evidence that would have allowed the court to identify which costs *actually* contributed to the trespass traffic. Instead, its expert theorized various allocations of company-wide costs to the trespass traffic. BNSF's general testimony identifying a handful

of categories of "overhead" costs that might vary over some longer periods of time was insufficient. Any error was in BNSF's favor.

5.    Finally, BNSF identifies two purported errors in the district court's calculations, that it never raised below. It appears that the district court made a minor error when transposing the number of railcars that could have stopped in Portland in 2019, which increased the judgment by $381,491. But the other claimed calculation error was an intentional determination explained in the district court's order.

## STANDARD OF REVIEW

Disgorgement is an equitable remedy. *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015). The district court's grant of equitable relief is reviewed for abuse of discretion. *Metal Jeans, Inc. v. Metal Sport, Inc.*, 987 F.3d 1242, 1244 (9th Cir. 2021); *see also S.E.C. v. Hui Feng*, 935 F.3d 721, 737 (9th Cir. 2019) (applying abuse of discretion standard to disgorgement award). A district court abuses its discretion if it: (1) applies an incorrect legal rule or (2) the district court's application of the correct legal rule was illogical, implausible, or unsupported by inferences drawn from the factual record. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009).

This Court has not adopted the Tenth Circuit's application of damages review standards to disgorgement that carves out different standards of review for the decision to award disgorgement, the calculation of the disgorgement award, and the methodology for calculating it. *See Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1162 (10th Cir. 2013) (utilizing test applicable to damage awards). This test is unnecessary and inappropriate because the Restatement is intentionally flexible and gives courts broad discretion to fashion appropriate equitable remedies tailored to the facts of each case. *See* Restatement (Third) of Restitution § 1 cmt. a ("the inherent flexibility of the concept of unjust enrichment . . . means that the concept of unjust enrichment will not, by itself, yield a reliable indication of the nature and scope of the liability . . ."). No authority requires the district court to adopt a particular methodology to calculate disgorgement in every case and this Court should not adopt BNSF's proposed standard of review that would in effect always require a re-trial on appeal. Instead, this Court should confirm that a district court's disgorgement and apportionment findings are subject to deference. *See Cream Records, Inc. v. Jos. Schlitz Brewing Company*, 754 F.2d 826, 828 (9th Cir. 1985)

(giving deference to district court's apportionment analysis as factfinder); *Fifty-Six Hope*, 778 F.3d at 1077 (affirming calculation of disgorgement award, recognizing court's "wide scope of discretion in fashioning a remedy") (internal punctuation omitted).

## ARGUMENT

Disgorgement serves two primary goals: to prevent a tortfeasor from profiting from misconduct and eliminate incentives for future misconduct. Restatement (Third) of Restitution § 3 ("A person is not permitted to profit by his own wrong."); *id.*, cmt. c ("Restitution requires full disgorgement of profit by a conscious wrongdoer . . . because any lesser liability would provide an inadequate incentive to lawful behavior.").

Equitable disgorgement principles are necessarily flexible. Courts have broad discretion to fashion a remedy appropriate to the unique facts of each case: "[i]n determining net profit the court may apply such tests of causation and remoteness, may make such apportionments, may recognize such credits or deductions, and may assign such evidentiary burdens, as reason and fairness dictate, consistent with the objective of restitution" to "eliminate profit from wrongdoing, while

avoiding, so far as possible, the imposition of a penalty." Restatement (Third) of Restitution § 51(4), (5); *see Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California*, 813 F.3d 1155, 1163 (9th Cir. 2015) (looking to Restatement "when deciding questions of federal common law.").

The district court followed well-established principles to fashion the remedy for BNSF's lucrative, extensive, and willful trespasses over the Reservation. It held that the Tribe reasonably approximated BNSF's unlawful gains by establishing BNSF's "contribution" from the trespass traffic. It then put the onus on BNSF to justify deductions and apportionment. The district court found that BNSF did not meet its burden to show that it was entitled to retain the 99% of its profits it argued to keep.

BNSF now seeks to eviscerate a trial court's discretion by conflating a factual inquiry—the determination of what profits are and are not attributable to wrongdoing for purposes of apportionment—with a "legal" methodology. Such judicial handcuffs would contradict the very purpose of equitable relief. The district court was not obligated to accept BNSF's theories and arguments, and its refusal to adopt BNSF's

"methodology"—which it explicitly found did not reflect reality—was neither error nor an abuse of discretion. Nor was the district court required to apply the Restatement in a way that would effectively result in an unlawful condemnation of sovereign tribal land. This Court should affirm the district court's well-reasoned and fully supported judgment.

## I. Profit generated from railcar movements over the Reservation to the nearby refineries are not "remote" from BNSF's trespasses.

BNSF contends that the district court "disregarded" the "rule" prohibiting disgorgement of "unduly remote" profits and "did not mention this rule, much less apply it." Br. at 2, 31. This is false. The district court expressly acknowledged and applied the Restatement, including Sections 40 and 51, both of which proscribe disgorgement of unduly remote profits. *See* 1-ER-4 ("'restitution may be limited to avoid a liability for gains that are unduly remote'") (quoting Restatement (Third) of Restitution § 40 cmt. b); 1-ER-28–30. That the district court did not linger on the remoteness question is not surprising. There is simply nothing remote—physically or logically—between BNSF's trespasses to deliver crude to the nearby refineries and the profits from

those deliveries. BNSF presented no evidence to the contrary. Although BNSF frames its quibble with the district court's ruling as a legal error, in a transparent play for *de novo* review, its real disagreement lies with the district court's factual determinations within the confines of these rules—which can only be disturbed if clearly erroneous or an abuse of discretion.

### A. The District Court did not abuse its discretion in finding that BNSF's profits from transporting railcars were directly attributable to the trespasses over the Reservation.

BNSF's principal argument is that the district court miscalculated the disgorgement award because it purportedly failed to consider whether the profits it disgorged were "unduly remote" from the trespass. This argument makes little sense.

Whether profits are unduly remote is a question of causation. Restatement (Third) of Restitution § 51 cmt. f. Here, there can be no dispute that BNSF's willful trespasses were a but-for and proximate cause of BNSF's profits. BNSF stipulated that it cannot deliver directly to the nearby Fidalgo Refineries without crossing the Reservation. SER-28. Every disgorged dollar is directly attributable to a trespassing railcar that unlawfully crossed the Reservation. Tribal land is

32

physically indispensable to the entire purpose of these unit trains and the profits derived therefrom. And all of BNSF's profits were directly attributable to the underlying trespasses and were not just foreseeable, but the intended consequence of BNSF's conscious decision to violate the Easement. The district court did not abuse its discretion in reaching its conclusion that BNSF's profits were caused by and directly attributable to its trespasses.

## B. BNSF presented no evidence to support its "unduly remote" arguments.

Although BNSF agreed that it could not deliver the trespassing railcars without crossing the Reservation, it nevertheless argues that because there were other lawful factors that *also* contributed to its ability to provide service to the Fidalgo Refineries, the district court was required to adopt its apportionment methodology to avoid disgorgement of "unduly remote" profits. But by arguing that the presence of multiple causes requires the court to adopt a particular apportionment methodology, BNSF conflates the causation inquiry with apportionment. *See* Br. at 34–35 (citing apportionment cases).

The existence of causes in addition to wrongdoing is neither unique nor dispositive. That it is "possible in almost every case to

identify additional *causes* of the profit" does not, without more, always require apportionment. Restatement (Third) of Restitution § 51 cmt. f. The factfinder may consider, for example, if "the defendant would have realized the profit in any event," or the profits "are the product of legitimate contributions by the defendant that should not, *in justice*, be awarded to the claimant," but these are factual determinations for which the trial court has considerable discretion. *Id.* (emphasis added). "A court's decision that one item of profit is properly attributable to the defendant's wrongdoing, while another is unduly remote, depends finally on its assessment of these and other factors affecting not only justice between the parties but the incentives to be created for others." *Id.*[5]

––––––––––––––––

[5] Contrary to BNSF's arguments, this analysis not subject to bright-line rules. *Compare* Restatement (Third) of Restitution § 51 cmt. e ("Few of the questions are susceptible to resolution by rule, and the answer given will be visibly influenced by the court's view of the broader context in which the question is presented—including the defendant's degree of culpability, the importance of the claimant's protected interest, and the remedial alternatives available as a practical matter.") *with* Br. at 59–60 (falsely representing that one sentence in the Restatement (Third) of Restitution § 51, comment e articulates a singular "rule" for a "but-for" analysis).

Even "a finding that the defendant would have realized the profit in any event does not compel the conclusion that the defendant, under the circumstances, has not been unjustly enriched." *Id*. Instead, when the wrongdoer's legitimate activities are at issue, the court must consider whether "the claimant, rather than the wrongdoer, should in these circumstances obtain the benefit of the [other factors contributing to the profit]," because a finding that any portion of the wrongdoer's profits were "remote" necessarily requires concluding that the defendant could retain those monies "without being unjustly enriched." *Id*.

BNSF attempts to confuse causation and apportionment for one reason: it bore the burden of proof to show which profits should be attributable to its lawful activities rather than its trespasses and it failed to meet that burden. 1-ER-9.

Here, BNSF presented no evidence that would have allowed the district court to place any significant value on the contributions of its rail network to the trespass profits. Evidence that its network and infrastructure facilitate BNSF's ability to serve customers merely

35

established that factors other than the trespass contributed to its ability to generate the profits.

At most, BNSF suggested that its profits were partially attributable to its lawful uses of network, but BNSF undertook *no* efforts to explain or quantify those activities or their importance. It merely offered its three pro-rata apportionment methodologies, briefly pointed to the Portland Alternative, and perplexingly argued that it could have unilaterally shipped *Tesoro's* or *Marathon's* oil to unidentified third parties. The district court carefully considered and rejected each of BNSF's apportionment methodologies as "unworkable." 1-ER-10. It was not required to accept BNSF's perceived but unspecified value of its network and could easily reject the contention that its rail network had equal—or even any—*relevant* contribution to BNSF's profit as did the Reservation where there was no alternative to reach the Refineries directly without trespassing. Indeed, BNSF's own expert conceded that BNSF would not have utilized its network to deliver to the Fidalgo Refineries if it could not cross the Reservation, thereby confirming that any contribution from the network could not make any

portion of the profits "unduly remote" from the trespass. 5-ER-743–44. The trespass was essential to benefit from the other causes.[6]

That BNSF disagrees with the district court's factual findings does not make them erroneous. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Indeed, while BNSF continues to tout its pro-rata apportionment theories, it does not even attempt to explain factually or legally why the district court's *rejection* of those theories was wrong, let alone clear error. *See* Br. at 46–47. It has therefore forfeited that argument on appeal.

Moreover, BNSF significantly overstates the contents of the record below. BNSF's record citations confirm that it presented no specific evidence about its "lawful" activities. *See* Br. at 11 (citing 3-ER-320–21 (summary judgment order describing BNSF's minimal communications

---

[6] Had the district court required BNSF to disgorge *post*-trespass, consequential gains, such as profits generated from the use of new tracks funded using the Fidalgo unit train profits, BNSF's arguments might be relevant. But the Tribe did not seek nor did the district court order disgorgement of any consequential gains.

with the Tribe about its common carrier obligations)); at 20 (citing 6-ER-1037–40 (BNSF's expert report, never admitted at trial, opining that BNSF could have shipped Bakken to other unidentified destinations and customers and pointing to Portland Alternative)); at 25 (citing 2-ER-40 (offer of proof authored by counsel describing generally that BNSF would have shipped Bakken to other customers)); at 40 (citing 2-ER-137, 142, 144, 148–50 (counsel's legal arguments in BNSF's motion for summary judgment with citations to evidence pertaining to calculation of interest/supplemental enrichment)); at 41–42 (containing no record cites).

BNSF relies on *Cream Records, Inc. v. Jos. Schlitz Brewing Company*,[7] but that case merely supports the undisputed proposition that *if* a court finds that some of the profits are not attributable to the infringement, any uncertainty does not prevent the court from making a rationally-based division. 754 F.2d at 828. *Cream Records* did not hold, as BNSF suggests, that this requires a specific apportionment. If BNSF's position were correct, in *Cream Records* this Court would have

---

[7] BNSF's reliance on *Olwell v. Nye & Nissen Company*, 26 Wash.2d 282, 284 (1946) is similarly misplaced because the court ordered disgorgement for *avoided costs*, not unlawfully obtained revenues.

required an assessment of what profits the distributor would have made had it used a song other than the plaintiff's copyrighted song in its advertisements. Instead, this Court recognized that the trial court's factual determinations must stand where: "the disparity between the amount sought by [defendant] and the amount awarded by the court appears to rest not so much upon a difference in methods of calculation as upon a disagreement as to . . . the importance of the copyrighted material to the effectiveness of the commercial. These were determinations for the district court to make." *Id*. at 829.

BNSF simply failed to carry its burden of showing that the massive profits it derived from unit trains—which would not have traveled any portion of BNSF's system if they could not cross the Reservation—should be apportioned on a pro-rata basis. The Court should affirm the district court's judgment.

## II. This Court should not second-guess the district court's apportionment analysis.

BNSF's challenge to the district court's order reflects a fundamental misunderstanding of the ruling. BNSF paints the district

39

court's analysis as an improper[8] but-for test, but had the district court applied but-for causation to apportionment, it would have disgorged *all* of BNSF's profits. The district court apportioned profits just as BNSF contends was required, following the Restatement's guidance where the wrongdoing was obviously both the proximate and but-for cause of BNSF's substantial profits. *Compare* 1-ER-9 ("the burden then shifts to BNSF to show that some portion of the net profits . . . arose from its legitimate activities and would have been realized even in the absence of the wrongful trespass") *with* Restatement (Third) of Restitution § 51 cmt. g (where profit realized "in part from the defendant's legitimate activities—so that some part, at least, of the defendant's profit would have been realized in the absence of the wrong—what proportion of the net profit is attributable to the wrong to the claimant? Because precise answers to this part of the apportionment problem are often

---

[8] BNSF's objection to the perceived "but-for" test is a thinly-veiled challenge to the applicable burdens of proof that recognized BNSF's responsibility to support retention of any of the trespass profits arising from its purportedly "legitimate activities." *See* Br. at 58 (citing *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 51 (2d Cir. 1939)). BNSF did not dispute this burden.

40

unattainable, the court will reach the best approximation it can under the circumstances.").

## A. The district court's apportionment was not an abuse of discretion.

The question the court answered was not "what profits would BNSF have made in a hypothetical world where it did not trespass[9]," but "what was the relative value of each segment of BNSF's rail network to BNSF's ability to generate the trespass profits." *BNSF itself* proposed this basic methodology but asked the court to attribute and apportion equal value for each mile or segment on a pro-rata basis. *See* 1-ER-10 ("BNSF . . . initially offered three possible allocation schemes, all of which break the North Dakota to Fidalgo Bay route into segments

_____

[9] Such a theory was foreclosed in *In re de Jong*, 588 B.R. 879, 893–94 (B.A.P. 9th Cir. 2018), *aff'd* 793 F. App'x 659 (9th Cir. 2020). In that case, the Court recognized that whether "a trespasser could have earned some or all of those profits without trespassing does not negate the fact that these net profits were earned by trespassing." *Id*. While the court did acknowledge that the trespasses "enabled [defendant's] entire [] business, not a mere component of a larger enterprise," that distinction does not mandate a different conclusion here. Payment for rail service is contingent upon reaching the desired destination. The trespass profits were generated from a non-divisible unitary service. They are the "entire enterprise" of serving the Fidalgo Refineries.

41

of various lengths and assign profits proportionally to those segments."). The court was not, however, required to accept BNSF's preferred valuation.

Instead, the district court recognized that the Fidalgo Refineries paid BNSF to deliver products from origin to destination. The usefulness of BNSF's rail network was therefore confined to its ability to serve them:

> the evidence shows that BNSF was paid for completed movements to the refineries, not for completed miles or segments of the route. Had BNSF brought unit or local trains to the eastern edge of the Reservation . . . it would have earned no revenues, much less profit. BNSF's proposed allocation schemes break the route into unworkable segments that do not align with any rail facilities and would not result in the delivery of materials to the March Point refineries.

1-ER-10. Nevertheless, the court recognized that there was *one* point along the route where BNSF could stop the unit trains and get paid something: Portland. Accordingly, the court found that the only portion of the route between North Dakota and Fidalgo that provided value independent of the trespass was the portion between North Dakota and Portland. 1-ER-10–18.

But the district court also found that the value of the Portland segment was constrained in time and volume and therefore could not

justify an across-the-board reduction in BNSF's disgorgement liability. Based on the testimony of BNSF and Marathon witnesses, the district court found that during the Trespass Period Zenith was the only viable transloading facility and was itself only available beginning in November 2018. 1-ER-11–18. The court acknowledged that with Zenth's limited capacity during the Trespass Period, BNSF could not have diverted all trespassing unit trains to Portland; it therefore calculated the additional transloading Zenith could have accommodated. The district court assumed a maximum throughput of 16-17 unit trains per month based on the average of the highest three consecutive months in 2023—two years after BNSF finally complied with the Easement—and gave BNSF credit for this additional, unutilized maximum capacity (which exceeded the actual transloading capacity during the Trespass Period). 1-ER-13–15.

BNSF's hypothetical investment in other transloading options was also irrelevant. The portion of BNSF profits attributable to its lawful use of its rail line *when* it trespassed between 2012 and 2021 would not change based on hypothetical choices that BNSF did not make. BNSF points to *no* authority that the district court was required to consider

"what would have happened *but for*, or in the absence of the trespass, and, specifically, whether BNSF and Marathon would have worked to *upgrade and use* those facilities during the period of trespass." Br. at 57; *see also* Br. at 54–57.

But the district court did consider this evidence. With respect to Zenith, by giving BNSF credit for the 2023 transloading capacity, the district court implicitly incorporated BNSF's unsubstantiated claims that it would have devoted resources to increasing transloading at that facility sooner. 1-ER-13. For the other facilities, the district court found BNSF's testimony to be vague and non-credible. 1-ER-10–18. And Marathon's unrebutted testimony confirmed that between 2013 and 2018, Marathon was exclusively focused on Vancouver Energy and only considered alternatives once it knew that its permit would not be granted. 5-ER-716. BNSF suggests that the district court was required to ignore this testimony. Tellingly, BNSF witnesses did not testify that BNSF has attempted to upgrade, expand, or utilize any facilities other than Zenith for transloading Bakken to Fidalgo *since* May 2021 when it ceased transporting unit trains over the Reservation. It was therefore

reasonable for the district court to reject BNSF's speculative, post-facto, and self-serving guesses about what it might have done.[10]

The district court applied a distance-based apportionment, as sought by BNSF, but disagreed with BNSF's evaluation of the relative significance of BNSF's use of its rail network compared to its unlawful use of the Reservation to generate the trespass profits. These factual determinations are subject to broad discretion. *See Cream Records*, 754 F.2d at 828–29. BNSF does not argue that the district court abused its discretion. The judgment should be affirmed.

## B.   The district court properly excluded evidence related to BNSF's ability to serve other customers.

The district court correctly disregarded evidence that BNSF could have transported the Bakken crude to other customers. The inquiry is the relative significance of BNSF's trespass compared with its lawful

---

[10] BNSF also complains that "these issues were raised at the last minute with insufficiently supported evidence." Br. at 59. Not so. The district court allowed BNSF to present evidence about transloading in Portland over the Tribe's objections that the Portland Alternative was belatedly (and vaguely) raised for the first time in BNSF's rebuttal expert report. 2-ER-92–94. BNSF introduced its Portland shipments; it cannot have it both ways and now complain that the district court utilized this information in a way that it might not have intended or foreseen. 1-ER-22–23.

use of its rail network in generating its profits from delivering railcars to the Fidalgo Refineries. BNSF's claimed ability to serve other customers provides no useful insight into answering that question. BNSF does not establish that the district court abused its discretion in excluding this testimony. *See Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1063 (9th Cir. 2022) ("We review a district court's decision to admit or exclude evidence for abuse of discretion.").

The district court rightfully limited BNSF's testimony on these issues. *See* 5-ER-795–98 (allowing testimony on BNSF's opportunities to ship Bakken generally). Even if the court had heard testimony consistent with the attorney-narrative offers of proof submitted by BNSF, it would not have changed the disgorgement calculus. *See* 2-ER-41; 5-ER-799; *see also United States v. Adams*, 271 F.3d 1236, 1242 (10th Cir. 2001) (noting that "[a]n offer of proof of testimony by counsel is the least favored method because of its potential to fall short of the standard required by the rules of evidence.").

BNSF asks this Court to ignore that it did not own the Bakken crude and had no right to unilaterally dictate where it was shipped. 5-ER-800–802. It defies logic to give BNSF credit for hypothetically

46

shipping Marathon's oil to BNSF's other customers, who are Marathon's competitors. Further, BNSF presented *no* evidence (nor did it suggest that it would have provided evidence) that by serving Marathon's unit trains it was unable to meet its other customers' demand for shipping Bakken—how BNSF would have used its engines and crews had they not been employed to the trespass service and what profits would have resulted is not only entirely speculative, but there was *no* evidence put forward from which the court could have attempted to evaluate this theory.[11]

## C. The district court was not required to consider BNSF's ability to average local train traffic.

Finally, BNSF reintroduces its claimed ability to *average* rail shipments to 25 cars per day to comply with the Easement. Nothing in the Easement permits averaging, as the Tribe expressly reminded BNSF. 3-ER-436; SER-70. BNSF cannot rely on hypothetical averaging or rescheduling of rail cars over the entire Trespass Period to retrospectively excuse its trespasses. If it could have complied with the

---

[11] The district court's refusal to consider this evidence is also supported by BNSF's failure to designate any witnesses during discovery on these issues. 2-ER-93.

Easement, it should have. But even if averaging was permissible—which it was not—BNSF put forth no evidence that it was actually possible to reschedule shipments to adhere to the 25-per day limit every day during the Trespass Period. BNSF only compared the total number of railcars it ran with the total it could have run cumulatively during the Trespass Period based on a daily 25 car limit. Br. at 63. The district court was not required to assume that BNSF could or would have complied.

Again, BNSF fundamentally misunderstands the district court's apportionment methodology. The district court asked what portion of the profit earned by BNSF should be apportioned to the trespass versus the lawful use of its rail network in light of the causal attribution analysis. But unlike unit trains, which could have been diverted to Portland, the testimony was clear that there was no other way to get the commodities shipped by local trains to the Fidalgo Refineries without crossing the Reservation. 5-ER-695–98. Because there was no way to utilize its rail network to realize profits from the excess local trains without trespassing, the district court held that BNSF's rail network—even though it may have been a causal factor—had no

realizable value and thus BNSF was not entitled to any apportionment of local train profits.

### D. BNSF's reliance on factually distinct cases hardly renders the district court's apportionment here an abuse of discretion.

That other courts have apportioned between lawful and unlawful gains in materially different factual contexts did not require the district court to adopt BNSF's preferred apportionment, nor does it require vacatur of the disgorgement award. The courts in those cases likely could have reached different judgments on apportionment without abusing their discretion, and their equitable resolutions of different cases hardly renders the decision below an abuse of discretion. *See Holland v. Fla.*, 560 U.S. 631, 649–50 (2010) ("often the exercise of a court's equity powers . . . must be made on a case-by-case basis. In emphasizing the need for 'flexibility,' for avoiding 'mechanical rules,' we . . . recognize that courts of equity can and do draw upon decisions made in other similar cases for guidance . . . with awareness of the fact that specific circumstance . . . could warrant special treatment in an appropriate case.") (internal citations and quotations omitted). The

cases BNSF cites do not establish that the district court abused its discretion in this case.

      1. *The remoteness analysis applied to consequential gains is inapplicable.*

BNSF principally relies on cases addressing remoteness with respect to consequential gains. Here, the Tribe did not request nor did the district court award consequential gains.

Indeed, in *SEC v. Ahmed*, the Second Circuit differentiated between gains attributable to the underlying wrong and consequential gains. 72 F.4th 379 (2d Cir. 2023). In calculating profits arising from the defendant's failure to disclose his conflicts of interest in stock transactions, the court rejected arguments that the defendant should receive credit for subsequent increases in the stock's value due to external market forces: "[Defendant's] fraud may not have driven [the] entire growth, but it permitted him to realize profits driven by that growth." *Id*. at 397. So too here. BNSF's lawful use of its network may have driven some of its ability to generate profits for the trespassing traffic, but its trespasses permitted and were essential for BNSF to realize the benefit of that lawful activity. The *Ahmed* court, however, remanded the case back to the district court to determine whether the

50

defendant's "actual gains" on frozen assets, which the court correctly identified as *consequential* gains, were unduly remote from the fraud. *Id*. at 404–05. The award here does not include any comparable consequential gains.

In *Siebel v. Scott*, the defendant fraudulently induced his partners to sell him their partnership interests, only to turn around and sell the partnership's assets to a new partnership for a windfall of over $1 million. 725 F.3d 995, 997–98 (5th Cir. 1984). The court recognized that the appropriate remedy would be to award the greater of the defrauded investors' losses or disgorgement of the wrongdoer's profits. *Id*. at 1001–1002. It nevertheless held that the district court was required to determine whether the defendant's profits arose from simple arbitrage or the "special or unique efforts [] other than those for which he is duly compensated" that added value to the partnership's assets prior to the later sale (e.g., improvements made by the wrongdoer to increase the value). *Id*. at 1002.

This rule cannot apply to BNSF's trespasses for three reasons. First, there are no cases applying it outside of the securities fraud context. *See Janigan*, 344 F.2d at 787 (origin of rule); *cf.* Restatement

(Third) of Restitution § 58 cmt. i, ill. 26 (applying to fraud for art supplies). Second, BNSF's profits were compensation for services rendered. This rule contemplates that a person may provide services *without* compensation that will increase the value of securities. And third, this rule applies to value added *after* the misconduct, not as part of it. Here, the only "value" BNSF added after its trespass was the transport of railcars the short distance past the Reservation to the Fidalgo Refineries. BNSF presented no evidence at trial showing the distance of this segment nor did it argue that it should be entitled to retain a pro-rata portion of the profits attributable to it.

Even in the trespass context, only consequential gains—not directly attributable profits—are limited on "unduly remote" grounds. *See* Restatement (Third) of Restitution § 53 cmt. d, ill. 11. In the geological survey hypothetical, the trespasser was unjustly enriched by $50, the ordinary cost of conducting a survey that revealed information allowing the oil company to acquire mineral rights worth $5 million. The Restatement acknowledges that in this circumstance "a court is likely to find that the greater part of the Company's profits are too remote," (indeed, it was merely fortuitous that the survey revealed

extensive deposits that were not accessed by the trespass) but this illustration has no parallels to BNSF's trespasses. Not only is access to the Reservation not "ordinarily obtainable" for a nominal fee, but BNSF's profits were directly attributable to the delivery of railcars that could not have reached the intended destination without trespassing.

Fundamentally, the disgorgement here does not reflect the kind of consequential gains at issue in those securities cases or the geological survey example. Those cases might be relevant if BNSF were a vertically integrated transportation and petroleum company and the Tribe sought to recover the profits made from the sale of refined Bakken crude. But none of that is true.

### 2. BNSF relies on materially distinct trespass cases.

BNSF's other trespass cases have materially different facts. In *Edwards v. Lee*, 96 S.W.2d 1028 (Ky. 1936), the defendant created a tourist attraction in an underground cave accessible from his property. *Id*. at 1028–29. While one-third of the tunnels fell within the plaintiff's adjacent tract of land, it was possible to operate the attraction using only tunnels within defendant's property. *Id*. at 1032–33. Accordingly, although the portions of the cave within the plaintiff's property

contributed to the draw of the attraction, it remained possible to operate a smaller attraction without trespassing. *Id.* Accordingly, the court concluded that a third of the total profits generated during the period of trespass "was a fair determination of the direct benefits accruing to the [defendant] from the use of the [plaintiff's] property." *Id.* at 1033. Here, the only profits BNSF could lawfully generate from its use of the Easement were for traffic that complied with its volume restrictions. *Edwards* is therefore not analogous because BNSF's trespass was essential and necessary for *all* of its profits from excess rail traffic.

The gas storage illustration, based on *Beck v. Northern National Gas Company*, 170 F.3d 1018 (10th Cir. 1999), is also materially different because the defendant was an innocent trespasser. *Id.* at 1024; *see also* Restatement (Third) of Restitution § 40, ill. 5 ("[defendant's] liability as an innocent trespasser will be limited to the value of what [defendant] took from [plaintiff], as opposed to a share of the resulting profits"—a reasonable license). Even assuming a willful trespass, in this situation where 85% of the gas was stored lawfully on the defendant's property and, but for the unavoidable gas migration to the plaintiff's

property, it would have earned 85% of the profit, disgorgement of the 15% earned from storing additional gas would be appropriate. Here, the testimony was clear: the Refineries would not pay BNSF anything to transport railcars up to the swing bridge and stop, so BNSF would not have earned any profit without trespassing. If anything, this example further bolsters the district court's Portland Alternative apportionment.

Finally, while BNSF invokes *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Company*, that decision is both factually and legally distinguishable. The trespass there was in the middle of the pipeline route, not immediately adjacent to the indispensable final destination, and thus there were possibilities for a workaround not available in this case. Additionally, the pro rata apportionment applied by that court was not based on a finding that the profits were unduly remote from the wrongdoing, but because a full disgorgement would be disproportionate to the trespass and the Band's harm. No. 19-cv-602-wmc, 2023 WL 4043961, at *18 (W.D. Wis. June 16, 2023) (on appeal). Notably, nothing in the Restatement supports such a reduction; instead, it expressly states that the award should be premised on the wrongdoer's gain, *not*

55

the victim's harm. Restatement (Third) of Restitution § 51(4); *see also Loftsgaarden*, 478 U.S. at 663 ("[i]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them."). The district court observed this and declined to follow *Bad River* as factually distinct and inconsistent with the Restatement. 1-ER-37.

### 3. Intellectual property cases are poor comparisons because the resulting products have multiple, independent profit drivers.

BNSF's intellectual property cases provide little guidance because the profit-generating activities at issue consist of complex amalgamations of various components, which independently and severally provided value. In contrast, any value provided by BNSF's rail network could not be realized without crossing the Reservation.

In *Sheldon v. Metro-Goldwyn Pictures Corporation*, 309 U.S. 390 (1940), a studio acquired movie rights to a novel and sought to, but did not, obtain similar rights to a play based on the same events. *Id.* at 397. The studio could have produced a movie with what it had, but "not content with the mere use of that basic plot," the studio "deliberately plagiarized" the copyrighted play. *Id.* The Supreme Court affirmed the

apportionment of profits between the infringing components and the non-infringing "expert and creative operations involved in its production and direction." *Id*. at 406. It acknowledged that the evidence clearly established "that in the creation of profits from the exhibition of a motion picture, the talent and popularity of the 'motion picture stars' generally constitutes the main drawing power of the picture." *Id*. at 407. Here, the district court found that the main—indeed only—consideration that a shipper has in paying for BNSF's services is the ability to receive railcars at the desired destination. 1-ER-10. Because the Fidalgo Refineries would not pay BNSF for incomplete delivery, there is no way to separate out BNSF's lawful use of its rail network leading up to the Reservation without enriching BNSF. *Id*.

Patent law also provides a poor analogy. When a physical product is comprised of multiple elements, only one of which infringes on a patent, unless the patentee can show that its patented component drove the entire demand for the product, the infringer need only disgorge the portion of profits attributable to the stolen component. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (describing "entire market value rule" and awarding royalty, not

disgorgement); *see also Garretson v. Clark*, 111 U.S. 120, 121 (1884) (requiring patent owner to apportion between value created by patented and non-patented features or demonstrate that the entire value of the product is attributable to the patented feature). If a product would still have commercial value if the infringing product were removed, it follows that retention of those profits would not unjustly enrich the infringer. Here, the Reservation cannot simply be removed from or replaced in BNSF's routes to Fidalgo and the refineries ascribe no value to BNSF's rail network unless BNSF can also cross Swinomish land.

Moreover, intellectual property cases reflect different policy considerations than those that apply to blatant trespass. As the district court noted, the Restatement distinguishes between intellectual property infringers and trespassers, allowing even deliberate infringers to receive "a credit for their legitimate contributions to the end result" that are unavailable to willful trespassers. 1-ER-29 (quoting Restatement (Third) of Restitution § 51 cmt. h).

*** 

As the Restatement recognizes, each case is unique and courts must be able to apply disgorgement principles flexibly. Disgorgement

cases serve as guideposts, not handcuffs, to courts in apportioning unlawful gains under the specific facts of each case. To the extent the district court reached a different conclusion than the factfinders in BNSF's exemplars, such a difference does not establish an abuse of discretion.

## III. BNSF did not present trial evidence to support tethering the disgorgement remedy to a hypothetical rent.

BNSF argues that if the district court were not required to adopt one of its pro-rata apportionments, it was required to limit disgorgement to a reasonable rental rate for its use of the Reservation. BNSF's positions are factually and legally unsupportable and will not deter future trespasses.

### A. BNSF's unjust enrichment is measured by its wrongful gain.

BNSF's and its amici's characterization of the disgorgement award as a "windfall" or unfair "enrichment" to the Tribe disregards one of the pillars of disgorgement: preventing a conscious wrongdoer from profiting from its wrong.

Despite agreeing that disgorgement is an appropriate remedy, BNSF confuses disgorgement and damages in seeking a rent-based

remedy. Disgorgement and damages are fundamentally different. By definition, disgorgement considers the wrongdoer's gain, not its victim's harm. *See* Restatement (Third) of Restitution § 1 cmt. a (recognizing that there is no "need to show that the claimant has suffered a loss" to identify the wrongdoer's gain); § 3 cmt. c (recognizing that disgorgement applies when wrongdoer's benefits exceed claimant's recoverable losses). When the amount of a defendant's ill-gotten gains exceeds the amount of the plaintiff's harm, the difference is not a windfall, but simply a reflection of the difference in these remedies and why damages are insufficient in certain circumstances.

Disgorgement is an available remedy in trespass cases precisely because the benefits to the trespasser often dwarf the harm to the landowner: in "cases in which a property owner may have suffered no quantifiable injury from the defendant's unlawful interference . . . [restitution] protects the owner's right to insist that any use of property by another—whether or not it diminishes the property's value—be made with the owner's consent and on the owner's terms." *Id*. at § 3 cmt. c. "[A] remedy limited to compensation does not vindicate the claimant's right to insist that the transaction at issue . . . take place by

agreement with the claimant or not at all. If a conscious wrongdoer were able to make profitable, unauthorized use of the claimant's property, then pay only the objective value of the assets taken or the harm inflicted, the anomalous result would be to legitimate a kind of private eminent domain (in favor of a wrongdoer) and to subject the claimant to a forced exchange. The law of restitution responds to this anomaly by making the wrongdoer liable to disgorge profits wrongfully obtained, whenever such profits exceed recoverable damages." *Id.*

Tellingly, the only Restatement section BNSF cites for its contention that liability may be limited if disproportionate to the loss is Section 58(3)(c), which applies (again) to consequential gains, "when property from which a claimant is entitled to restitution is exchanged for a more valuable product." *See* Br. at 43; Restatement (Third) of Restitution § 40 cmt. b (describing circumstances in which courts may decline to measure unjust enrichment "by the full extent of the consequential gains that an intentional trespass may have facilitated."). This has not happened here.

BNSF also invokes academic articles authored by amicus Professor Mark Gergen. Although Professor Gergen notes that he is an

"Advisor" to the Restatement, Gergen Br. at 1, it is a matter of public record that he disagrees with the consensus reached by the Restatement's contributors. *See, e.g.*, Mark P. Gergen, Causation in Disgorgement, 92 Boston University Law Review 827, 829 (2012) ("[T]he *Restatement (Third) of Restitution and Unjust Enrichment* is on the wrong track."). Indeed, if Professor Gergen's position reflected the Restatement, BNSF would cite the Restatement, not Professor Gergen's *ipse dixit* viewpoint.[12]

## B. An award tied to hypothetical rent would disregard the Tribe's sovereignty.

Even if the Tribe's harm were relevant to calculating BNSF's gain, BNSF's arguments still fail.

First, BNSF abandoned its rent-based theory when it failed to present any evidence about a hypothetical rental rate at trial. It points this Court to its expert's report (Br. at 44, citing 6-ER-965), but did not

---

[12] Professor Gergen's position is inconsistent with his previous amicus filings. *See* Brief of Restitution and Remedies Scholars as Amicus Curiae in Support of Respondent at 15, *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) (No. 13-1339) ("There are well known examples where the trespass was harmless . . . but [plaintiff] could still recover trespasser's profits." (citing *Raven Red Ash Coal Co. v. Ball*, 29 S.E.2d 231 (Va. 1946))).

have this expert testify about his hypothetical rent damages theory at trial nor admit the report as a trial exhibit. 4-ER-643–72; SER-5–14. The district court did not err by failing to consider evidence that BNSF never offered at trial.

Second, BNSF falsely states that the "maximum rental value" is undisputed, relying on the Tribe's appraisals prepared to adjust the Easement rent for 25-car per day access as the source of the purported agreement. But there is no evidence that the Tribe would have agreed to increase rail traffic under *any* terms, let alone the same rent formula applicable to limited traffic volumes. Nor is there support for BNSF's implication that the Tribe was obligated to utilize the Easement's rent formula for the hundreds of thousands of unauthorized, excess railcars.

Indeed, BNSF itself proposed a per-car rent formula in the context of its failed bid to compel arbitration that would have resulted in a disgorgement award more than double what it suggests that "maximum" rent could be now. SER-50–51. That proposal confirms that a rent-based award would allow BNSF to profit from its wrongdoing. BNSF proposed that a $21.7 million rent-based award would be equitable and non-punitive. Now it proffers pro-rata and rent-based

63

theories that would require it to pay significantly less, Had the district court adopted one of BNSF's proposals, it would have—under BNSF's own admission—resulted in BNSF retaining profits indisputably attributable to its trespasses. *Id.*

Third, BNSF's suggestion that its liability should be capped at a reasonable rental rate would effectively allow private condemnation of tribal lands. This is expressly prohibited by federal law and contrary to bedrock principles of tribal sovereignty. *See* 25 U.S.C. § 357 (limiting eminent domain of property owned by Indian allottees); *United States v. Pend Oreille Cnty. Pub. Util. Dist. No. 1*, 135 F.3d 602, 614 (9th Cir. 1998) (confirming tribal trust land cannot be condemned). Cabining the Tribe's harm to "lost rent" ignores that the Tribe was greatly—and unquantifiably—harmed by BNSF's near-decade long impingement on the exercise of its sovereign rights as confirmed in the Treaty and the IRWA to exclude non-natives from its Reservation. *See United States v. Osage Wind, LLC*, 710 F. Supp. 3d 1018, 1040 (N.D. Okla. 2023) (trespass by corporation constitutes an irreparable harm to tribal sovereignty).

As this Court recognized, the "three sources of federal law underlying the Easement Agreement: federal common law, the Treaty of Point Elliott, and the Indian Right of Way Act," expressly protect tribal rights to control access to tribal lands. *Swinomish*, 951 F.3d at 1153. The Treaty and IRWA require tribal consent in accordance with the Tribe's status as an independent sovereign. Allowing trespassers to merely pay an ex post facto rental rate bereft of the required tribal consent would grant bad actors like BNSF a loophole to eviscerate tribal sovereignty.

This Court does not need to adopt a special rule for trespasses on sovereign land to reject BNSF's rent-only position. The Restatement is clear: the question is not what harm the Tribe suffered, but what BNSF wrongfully obtained. Further, the Restatement expressly provides that "market value" sets the *floor* not the ceiling for liability. Restatement (Third) of Restitution § 51(2). Using BNSF's manufactured "maximum annual rent" as a proxy for the Tribe's "harm" or "compensatory damage" is not only inappropriate—the Tribe cannot be compelled to accept BNSF's desired rental rate and it never agreed to unlimited rail traffic—but violates the Restatement principle that a conscious

65

wrongdoer who "intentionally bypassed an existing market—consciously taking without asking, or proceeding in the face of the owner's refusal" cannot claim that its unjust enrichment is properly measured by ordinary rental value. Restatement (Third) of Restitution § 40 cmt. b.

Finally, a rent-based disgorgement will do nothing to deter future trespasses, contrary to a fundamental purpose of the disgorgement remedy. BNSF's amici suggests that disgorgement liability should be limited to a rent-based theory specifically to allow commodity transporters to willfully disregard landowners' objections to the use of their property. Chamber Amicus Br. at 11; *see also* Washington Law Foundation Amicus Br. at 16–17 (suggesting that disgorging *willful* trespass profits would discourage legitimate business activities for fear of *inadvertent* violations); Br. at 52.[13] The Court should not adopt apportionment methodologies for the benefit of would-be trespassers.

---

[13] BNSF's amici's fearmongering about hypothetical duplicative disgorgement awards along a rail route are unsupported. *See* Chamber of Commerce Amicus Br. at 12; Washington Law Foundation Amicus Br. at 12. There is no evidence that BNSF trespassed elsewhere. But, even if it had, equitable principles would prevent cumulative disgorgement of profits generated from unitary service to a destination. By definition, profit can only be disgorged once.

BNSF's own actions make this clear. The settlement of the Tribe's initial trespass case against BNSF, as reflected in the Easement, provided for a payment representing "all rent, damages and compensation of any sort" for a century of unconsented use. 3-ER-429. But payment of this rent-based compensation was obviously insufficient to deter BNSF from again trespassing for nearly a decade.

**C. Limitations on punitive awards do not apply to disgorgement awards because disgorgement awards are not punitive.**

Constitutional limitations on *punitive* damages also have no relevance to disgorgement. While equitable principles prohibit disgorgement awards that constitute a "penalty," they do so by ensuring that those awards do not exceed the defendant's profits attributable to the misconduct. *See Liu*, 591 U.S. at 83–84. The possibility that a defendant's profits might exceed the plaintiff's provable losses is the *raison d'etre* of the disgorgement remedy and certainly does not convert a valid disgorgement remedy into an impermissible penalty. Moreover, the Restatement recognizes that if a court must choose between the risk of allowing a defendant to retain ill-gotten gains and the risk of imposing a penalty, the court must err on the side of imposing a

penalty. Restatement (Third) of Restitution § 51(4), (5). This factual determination should be left to the district court's discretion.

BNSF cannot not be "punished" by being forced to give up what it should never have earned. While BNSF focuses on the size of the district court's award, BNSF ignores that the award reflects its gains generated from the trespass of over 200,000 railcars over nearly nine years. BNSF also ignores the multiple findings the district court made in *its* favor that significantly reduced the total judgment, including allowing BNSF to retain substantial (but unsubstantiated) fixed costs and applying the lowest proposed interest rate, even though the Restatement suggested a higher rate. 1-ER-6–8, 18–20. The award is consistent with BNSF's refusal to honor its promises to the Tribe or respect the Tribe's right to restrict access to its land. That BNSF dislikes the amount of its profits that it must disgorge does not make the district court's judgment punitive.

## IV. The district court correctly declined to deduct all of BNSF's fixed costs.

The district court did not err in refusing to give BNSF credit for the entirety of its "fixed costs" or overhead expenses BNSF arbitrarily

assigned to the trespass traffic. BNSF bore the burden to provide evidence to support cost deductions and failed to do so.

The Restatement makes clear that "profit" in the restitution context is *not* synonymous with the accounting definition of profit but "includes any form of use value, proceeds, or consequential gains that is identifiable and measurable and not unduly remote." Restatement (Third) of Restitution § 51(5)(a). When it comes to deductions, the Restatement explicitly refutes BNSF's position that it is entitled to a deduction for *all* costs: "the defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement. . . . By contrast, the defendant will not be allowed to deduct expenses (such as ordinary overhead) that would have been incurred in any event, if the result would be that defendant's wrongful activities—by defraying a portion of overall expenses—yield an increased profit from defendant's operations as a whole." Restatement (Third) of Restitution § 51 cmt. h; 1-ER-5.

Consistent with these principles, this Court has recognized that a defendant may claim credit for overhead expenses only if it can show specifically what costs directly and *actually* contributed to its

infringement. *See Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1332 (9th Cir. 1984) ("allowing a deduction for overhead only when the infringer can demonstrate it was of actual assistance in the production, distribution or sale of the infringing product.") (internal citation omitted).

BNSF did not meet this burden. Although BNSF represents that its "expert also deducted long-term costs . . . associated with trespassing trains that varied on a longer time frame" and that "these costs would *not have been incurred* absent running trains for nine years over the route to Fidalgo," that is unequivocally false. *See* Br. at 65–66. Indeed, the district court found the opposite: "BNSF has not provided evidence that those expenses would have been avoided had it honored the Easement Agreement." 1-ER-8. "Instead, BNSF simply assigned long-term operating costs to the trespassing shipments in proportion to their variable costs, switch events, financial metrics, train miles, or other service-related units." 1-ER-8. BNSF's controller confirmed that the overhead metrics reflected company-wide costs incurred on its entire network. 4-ER-635. There is not, as BNSF suggests, "undisputed evidence that these costs are directly related to the operations to

Fidalgo over the extended period of trespass." Br. at 66 (citing testimony regarding ATC methodology).

While at trial BNSF's controller identified a handful of specific costs that are associated with transporting products to the Fidalgo Refineries, she did not offer any testimony that would have allowed the district court to quantify those costs, let alone conclude that *all* of BNSF's overhead costs allocated to the trespassing traffic would not have been incurred absent the trespass. *See* 1-ER-8; 4-ER-621–30. Instead, the controller listed a few cost categories that may have some unspecified variable component not already captured in ABS. She further testified that it would have been possible for BNSF to isolate fixed costs that were actually associated with the trespassing traffic, but that it just did not perform that analysis. 4-ER-635–36.

Nevertheless, although the district court found that BNSF was only entitled to deduct marginal costs—which BNSF never calculated outside of ABS—it allowed BNSF a partial deduction of its allocated company overhead. 1-ER-8–9. To the extent that the district court erred, it was in BNSF's favor. This Court should not disturb the district court's findings with respect to calculation of deductible marginal costs.

**V.    BNSF did not raise the district court's purported math errors below.**

BNSF identifies purported "math errors" in the district court's calculations that it blames on the Tribe. But the district court did not even reference the Tribe's calculations in its order. Instead, the Court independently reviewed and made calculations based on the DEQ reports. 1-ER-13–16. As BNSF notes, it appears that the district court made a *transcription* error in calculating the deduction for trespassing unit train cars in 2019. Br. at 68. BNSF did not raise this issue in a post-trial motion and thus it is waived. Nevertheless, the Tribe is not opposed to modifying the judgment to address the Court's minor calculation discrepancy for 2019 to reduce the judgment by $381,491— 72.52% of the additional profit of $526,050 attributable to the 450 inadvertently omitted cars. BNSF also argues that the district court incorrectly identified the profit differential between direct service to Fidalgo and service to Portland of 72.52%, when it should have been 81.77%. *Id.* at 68–69. But in footnote 3, the district court explained its rejection of BNSF's $1,026 per-car profit (found in 3-ER-457) in favor of $1,157. 1-ER-11 (selecting higher number between BNSF's rebuttal

report and trial exhibit 68). BNSF does not challenge this explanation or show that it constitutes clear error.

## CONCLUSION

BNSF impermissibly asks this Court to invade the district court's province as factfinder to identify BNSF's ill-gotten gains from its conscious, willful, and knowing trespasses over the Reservation. BNSF's disagreement with the district court's findings does not demonstrate legal error.

Although BNSF professes to regret its wrongful actions in its long history with the Tribe, it immediately criticizes the district court for ignoring the market value of the Tribe's loss. The harm to the Tribe's sovereign authority is irreparable and unquantifiable. Further, the resolution of the Tribe's initial trespass lawsuit, based upon rent, was obviously insufficient to deter a repetition of that long history. Only disgorgement of BNSF's wrongful gains will deter future trespasses when lucrative opportunities arise.

This Court should affirm the judgment with an adjustment to account for the district court's minor transcription error.

Respectfully submitted,

Dated: March 7, 2025

**TOUSLEY BRAIN STEPHENS PLLC**

By: */s/ Christopher I. Brain*
    Christopher I. Brain, WSBA #5054
    Email: cbrain@tousley.com
    Rebecca L. Solomon, WSBA #51520
    Email: rsolomon@tousley.com
    1200 Fifth Avenue, Suite 1700
    Seattle, Washington 98101
    Telephone: 206.682.5600
    Fax: 206.682.2992

**OFFICE OF THE TRIBAL ATTORNEY, SWINOMISH INDIAN TRIBAL COMMUNITY**

By: */s/ Stephen T. LeCuyer*
    Stephen T. LeCuyer, WSBA #36408
    Email: slecuyer@swinomish.nsn.us
    Weston R. LeMay, WSBA #51916
    Email: wlemay@swinomish.nsn.us
    11404 Moorage Way
    LaConner, WA 98257
    Telephone: 360.466.1058
    Fax: 360.466.5309

*Attorneys for Swinomish Indian Tribal Community*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 24-4333

I am the attorney or self-represented party.

**This brief contains** | 13,998 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [ ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Christopher I. Brain | **Date** | 3/7/2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiff-Appellee Swinomish Indian Tribal Community states that it does not know of any related case currently pending in this Court. There was a prior interlocutory appeal in this case, in 2018, Case No. 18-35704.

Dated: March 7, 2025      By:   *_/s/ Christopher I. Brain_*
                                    Christopher I. Brain

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 7, 2025                By:  */s/ Christopher I. Brain*
                                             Christopher I. Brain